## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Leah Bogdanowicz, being first duly sworn, hereby depose and state as follows:

### Introduction and Agent Background

1. I make this affidavit to show that probable cause exists to believe that on or about January 20, 2025, within the District of Vermont, Teresa Youngblut (hereinafter, "YOUNGBLUT") intentionally used a deadly weapon—a firearm—while forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with Border Patrol Agents while they engaged in—or on account of the performance of—their official duties in violation of 18 U.S.C. § 111(a) and (b). Further, there is probable cause to believe that YOUNGBLUT used and discharged the firearm during and in relation to the assault with a deadly weapon, which constitutes a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii).

2. I am a Special Agent of the Federal Bureau of Investigation (FBI), an agency of the Department of Justice. I am empowered to investigate and make arrests for offenses of Title 18 of the United States (U.S.) Code. I have been a Special Agent of the FBI since December 2021. Prior to my employment with the FBI, I worked at PricewaterhouseCoopers in their Risk Assurance division for almost ten years, ending my employment as a Senior Manager. During my time at PricewaterhouseCoopers, I performed information technology audits and consultations on several Fortune 500 companies, including banking clients and other large financial institutions. My education includes a master's degree in Accounting and a minor in Information Systems.

3. During my employment with the FBI, I have been trained in various aspects of law enforcement, including criminal and national security investigations. I have received training on and have investigated a variety of federal crimes involving cyber intrusions and computer fraud.

1

I have experience regarding these federal violations through my daily investigative responsibilities and extensive training. For example, I have attended classes and trainings dealing with computer crimes and fraud, including how computer networks operate, methods employed by criminals to infiltrate computer networks and commit other crimes, the purpose of the intrusions, and the numerous types of fraudulent schemes that perpetrators of computer crimes carry out after gaining access to computer networks.

4. As a Special Agent of the FBI, I am responsible for conducting criminal investigations of criminal statutes contained in Title 18 of the United States Code, including assaults on federal officers. I have participated in the investigation of individuals for various violations of Title 18 of the United States Code. Through these investigations, my training, experience, and conversations with other law enforcement officers, I have become familiar with communication methods used by criminal subjects in various types of criminal enterprises, including communication by cellular telephones, Internet-based communication applications, and social media sites.

5. Because this Affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of the investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**Probable Cause**

6. On January 20, 2025, at approximately 3:00 pm, an on-duty, uniformed United States Border Patrol (USBP) Agent initiated a stop of a blue 2015 Toyota Prius Hatchback with North Carolina license plate number KLA2040 to conduct an immigration inspection as it was

driving southbound on Interstate 91 in Coventry, Vermont. The registered owner of the vehicle, Felix Baukholt, a citizen of Germany, appeared to have an expired visa in a Department of Homeland Security database. YOUNGBLUT was driving the Prius, and Baukholt was the lone passenger in the Prius. Multiple uniformed Border Patrol Agents were present at the stop in three USBP vehicles with emergency lights illuminated.

7. Between approximately 3:00 pm and 3:15 pm, agents reported gunshots at the scene. Supervisory Border Patrol Agent (SBPA) Cameron Thompson was notified of the incident and responded to the scene of the stop, arriving at approximately 3:35 pm. He spoke with two of the Border Patrol Agents involved in the incident. They described that both Baukholt and YOUNGBLUT possessed firearms and that YOUNGBLUT drew and fired a handgun toward at least one of the uniformed Border Patrol Agents without warning when outside the driver's side of the Prius.[1] Baukholt then attempted to draw a firearm. At least one Border Patrol Agent fired at YOUNGBLUT and Baukholt with his service weapon.

8. The exchange of gunfire resulted in Border Patrol Agent Maland, YOUNGBLUT, and Baukholt all sustaining gunshot wounds. Baukholt was declared deceased at the scene as a result of his injuries. Border Patrol Agent Maland was transported to North County Hospital for emergency care, but he was pronounced deceased at the facility at approximately 4:00 pm. YOUNGBLUT was transported from the scene to North County Hospital for emergency medical treatment and was ultimately taken to the Dartmouth-Hitchcock Medical Center in New Hampshire, where she is presently receiving in-patient medical care.

---

[1] As of the time of this application, formal interviews with the surviving Border Patrol Agents at the scene have not been conducted due to interagency constraints following an agent-involved use of deadly force. The information contained herein is based on statements from the involved Agents related to me by law enforcement who responded to the scene during and immediately after the exchange of gunfire.

9. Prior to the Prius being towed from the scene, a combination of Vermont State Police (VSP) Bomb Squad members, an FBI Special Agent Bomb Tech, and an ATF Special Agent Bomb Tech used remote technology—including a robot—to inspect and render the Prius safe based on concerns that it could contain explosive materials. The process involved the removal of some of the Prius's contents. All of the contents were either returned to the Prius in plastic trash bags prior to the towing or packaged and transferred to FBI custody for further examination pursuant to a search warrant.

10. After the Bomb Squad rendered the Prius safe as described above in paragraph 9, a VSP Crime Scene Search Team (CSST) documented and collected evidence from the scene of the stop. Among the items located and collected were:

- An M&P Shield EZ model .380-caliber pistol resting on the hood of a USBP Chevrolet Tahoe,
- A Glock model 23 .40-caliber pistol resting on the hood of a USBP Ford F150,
- A .40-caliber Glock magazine on the hood of the USBP Ford F150,
- A .40-caliber Glock magazine on the ground between the USBP Ford F150 and the Prius,
- A silver ammunition magazine on the ground between the USBP Ford F150 and the Prius, and
- Spent ammunition casings and intact ammunition cartridges on the ground: seven spent 9-millimeter casings, two spent .40-caliber casings, one intact .40-caliber cartridge, and one intact .380-caliber cartridge.

11. I am aware, from a conversation with Border Patrol Agent—Intel (BPA-I) James Loomis, an intelligence agent assigned to the Newport Border Patrol Station and a Task Force

Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), that the agents at the scene would have each been carrying exclusively 9-millimeter service pistols. I am further aware, from my training and experience, that the agents likely would have seized any handguns from suspects involved in the incident and cleared them by removing the magazine and opening the slide to eject any chambered cartridge before placing the firearms in a safe location, such as the hood of a law enforcement vehicle. Based on the information I received from SBPA Cameron Thompson, partially described above in paragraph 7, the .40-caliber Glock 23 was secured from on or near YOUNGBLUT after the incident, and the .380-caliber M&P Shield was secured from on or near Baukholt after the incident. The evidence located by CSST members would therefore be consistent with YOUNGBLUT having fired the .40-caliber Glock 23 at least twice from the driver's side of the Prius, one or more Border Patrol Agents returning fire with at least seven 9-millimeter shots, and then agents clearing the Glock 23 40-caliber and M&P Shield .380-caliber pistols, resulting in the described casings and cartridges being on the ground.

12. When searching the scene of the stop, CSST members also located a Washington-state driver's license in the name of Teresa Youngblut on the ground near the driver's side of the Prius. The CSST members also collected two packets of suspected cell phones wrapped in what appeared to be aluminum foil that were left behind the USBP Tahoe after the Bomb Squad clearance. The wrapped items are suspected to be cell phones based upon x-ray imagery taken by the Bomb Squad. When inspecting the Prius using the robotic equipment, the Bomb Squad observed several additional electronic devices in the Prius, to include an Apple iPhone, at least two additional cell phones, and multiple laptop computers.

13. Based on my conversations with law enforcement officers, Baukholt and YOUNGBLUT were observed by investigators prior to the stop of the Prius on Interstate 91

between the approximate hours of 11:30 and 2:35 pm at the Wal-Mart located at 115 Seymour Drive in Newport, Vermont. They observed Baukholt enter the Wal-Mart at approximately 1:00 pm and came out with what was later confirmed by Wal-Mart employees to be two packages of aluminum foil. YOUNGBLUT remained in the Prius in the driver's seat. When Baukholt returned to the vehicle, he was seen removing sheets of foil and wrapping unidentifiable objects while seated in the passenger seat. While in the Wal-Mart parking lot, investigators observed Baukholt making at least one phone call on a cell phone outside of the Prius; he was then observed entering the Prius with the cell phone and was not observed discarding it between the observed phone call and the later stop.

14. Investigators had been performing periodic surveillance of Baukholt and YOUNGBLUT since on or about Tuesday, January 14, 2025. A concerned citizen—an employee of a hotel in Lyndonville, Vermont—contacted law enforcement after a male and a female had checked into the hotel to report concerns about them, including that they appeared to be dressed in all-black tactical style clothing with protective equipment, with the woman, later identified as YOUNGBLUT, carrying an apparent firearm in an exposed-carry holster. Investigators with VSP and Homeland Security Investigations attempted to initiate a consensual conversation with Baukholt and YOUNGBLUT, but they declined to have an extended conversation, claiming that they were in the vicinity to look at purchasing property. After the contact with law enforcement, the pair checked out of the Lyndonville hotel on the afternoon of January 14, 2025. Investigators later observed the pair in similar tactical dress on Sunday, January 19, 2025, walking in downtown Newport; YOUNGBLUT was observed carrying a handgun at that time.

15. On January 21, 2025, I applied for and received a federal search warrant for the 2015 Toyota Prius occupied by YOUNGBLUT and Baukholt at the time of the stop under District of

6

Vermont case number 2:25-mj-5. FBI agents searched the contents of the Prius on the evening of January 21, 2025, and I have reviewed a preliminary list of pertinent items seized from the Prius pursuant to the warrant. Among those items, I note that the Prius contained various pieces tactical gear—including a ballistic helmet, night-vision-goggle monocular, a tactical belt with holster, and a magazine loaded with cartridges; two full-face respirators; 48 rounds of .380-caliber jacketed hollow point ammunition; a package of shooting range targets (some of which were used); two handheld two-way radios; approximately a dozen electronic devices and multiple removable electronic storage devices; documents containing identification, utility, lease, travel, and lodging information pertaining to multiple states; and an apparent journal found among YOUNGBLUT's identification documents.

## Conclusion

16. Based on the foregoing, I submit that there is probable cause to believe that on or about January 20, 2025, within the District of Vermont, Teresa YOUNGBLUT intentionally used a deadly weapon—a firearm—while forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with Border Patrol Agents while they engaged in—or on account of the performance of—their official duties in violation of 18 U.S.C. § 111(a) and (b). Further, there is probable cause to believe that YOUNGBLUT used and discharged the firearm during and in relation to the assault with a deadly weapon, which constitutes a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii). I respectfully request the Court issue a criminal complaint charging her accordingly and a warrant for her arrest.

Dated at Burlington, in the District of Vermont, this 22nd day of January, 2025.

_____
Leah Bogdanowicz, Special Agent
Federal Bureau of Investigation

7

Subscribed and sworn to before me in Burlington, Vermont on this 22nd day of January, 2025.

_____
HON. KEVIN J. DOYLE, Magistrate Judge
United States District Court
District of Vermont